We will hear argument first this morning in case 19-251, Americans for Prosperity Foundation v. Bonta and the Consolidated Case. Mr. Schaffer. Thank you, Mr. Chief Justice, and may it please the Court. We're here because the California Attorney General is demanding that tens of thousands of charities annually disclose their top donors nationwide, as listed on Schedule B to IRS Form 990. This demand casts a profound nationwide chill, and it does so for no good reason, Your Honors. As the District Court found following a full bench trial, California's upfront collection of Schedule Bs does not further the state's law enforcement goals. That finding is both dispositive and unassailable. Forty-six states today please charities without any such blanket demand. California itself likewise did so for years, Your Honors, without any problems. These Schedule Bs never find any legitimate use, unless and until a complaint comes in, as happens for only a fraction of 1% of all charities. Even when reviewed, Schedule Bs, for all of their extreme sensitivity, have only trifling utility. California used them in only a handful of investigations over ten years. The rare times when Schedule B has use, Your Honors, California has much narrower means to obtain it. Namely, a targeted audit letter to the charity of concern. Indeed, it's California's standard practice to issue precisely such an audit letter, requesting Schedule Bs and other documentation from any charity it investigates. At bottom, California's justification reduces to a claimed law enforcement interest in having all Schedule Bs prophylactically warehoused before it re-requests Schedule B pursuant to any actual investigation. That does not begin to justify the First Amendment intrusions here posed, as 40 amicus briefs from hundreds of concerned parties spanning the spectrum agree. Because California is up front, suspicionless demand for donor information is not narrowly tailored, as it must be under this court's precedence. It is unconstitutional in all its applications, and certainly in a substantial number of them. We respectfully urge this court to hold it facially invalid. Mr. Schaefer, your main argument is that we should apply strict scrutiny to the disclosure requirements here. But with respect to political speech, which we've held is, of course, at the heart of the First Amendment, when we have an issue of compelled disclosure, we apply exacting scrutiny. And doesn't it seem strange that when you're talking about charitable association, you would apply a more rigorous test than we apply to political association? Well, Mr. Chief Justice, I hate to dispute your premise, but I think that among the petitioners, it's the Thomas More Law Center that urges strict scrutiny. We, from Americans for Prosperity Foundation, have no quarrel with that. We think they make the argument well for that standard. But the prime imperative for the petitioners, Your Honor, is simply to stress that under any standard of exacting scrutiny that calls for narrow tailoring, this demand is facially invalid and due to be struck down. Across the board. Sorry, Mr. Chief Justice. I was going to say thank you for the correction. But when it comes to tailoring, what exactly is your understanding? I think what that means, I think it's not well settled under the exacting scrutiny standard. Well, I think Shelton gives you the holding, Mr. Chief Justice. Shelton specifically struck down the demand that teachers disclose their associations, and it did so for lack of proper tailoring, even while recognizing that there might be a substantial relationship to the understandable goal of protecting kids in schools. And so, you have the holding there, Vermillion articulates the standard too, specifically in this context. And I do note to your prior question that even in the election context, Buckley does speak in terms of strict scrutiny. It simply holds that disclosure is the least restrictive alternative in that context, categorically different from this context, and one where, of course, there's an interest in public disclosure that California disavows in this case. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, a couple of quick questions. How would it affect your analysis if the organization involved just did something that was not controversial, such as provide free dog beds or taking care of stray puppies or something like that? Would your analysis change in any way? It wouldn't, Justice Thomas, and I do note that among the amici supporting us is PETA, joining the brief by the nonprofit alliance. And so, their work too can be controversial, and depending upon one's views of how puppies should be handled, there can be controversy around that. We might not have thought before 2013, when California leaked the Schedule B of the Asian Americans for Advancing Justice, that that would be especially threatening for the donors there. But today, in 2021, it's sad to say it could be a life or death issue that their identities have been disclosed. Think about religious charities. Think about medical organizations that may take views about masking, about vaccinations. In our very divisive times, it's tough to identify with certainty a charity that is non-controversial in those respects. And even if there were that sort of a charity deposit, Justice Thomas, there are understandable concerns. Religious convictions desire not to lose privacy, not to be harassed by solicitations that donors legitimately have for charities across the spectrum. In this era, there seems to be quite a bit of loose accusations about organizations. For example, an organization that had certain views might be accused of being a white supremacist organization, or racist, or homophobic, or something like that, and as a result become quite controversial. Do you think that that sort of labeling would change your analysis? Well, I think it's part of the problem here, Justice Thomas. And there is expert testimony in the record from Paul Schirvis for both of these petitioners explaining that precisely because there is such intensity of views and there is such a proclivity to vilify perceived enemies in our times, that's part of what puts so much— it raises the stakes, if you will, and raises the concerns of reasonable donors for charities all across the spectrum. So that's there, but I also think this Court's precedent recognizes the history and the common sense that says donors to associations are concerned about having their identities revealed. That was true in Shelton, that was true for the NAACP, it was true for the Republican Party, and donors to the Republican Party in the Pollard case were, this Court summarily affirmed. What if the state of California did exactly what the U.S. government is doing and just simply requires this information as a part of your tax returns if you claim a deduction? Well, I'd note, Justice Thomas, that that is categorically different from the AG's interest in policing charitable fraud. They don't serve the tax function in California. Also, Congress has made a statutory judgment specifically for the IRS about a nexus between Schedule B and the information listed there and how it's to be used. And how is it to be used, Justice Thomas, for federal tax collection? So it's a comparison potentially of the individual donors' deductions on their federal tax forms, and the IRS has nationwide jurisdiction consistent with the nationwide scope of a Schedule B. None of that is true in California. Thank you. Justice Breyer? Thank you. If you win in this case, I think the Court will have in some form held that the interest of the donors in maintaining privacy of their giving to a charity, the interest of the charity in receiving those money, here at least, outweighs the interest of the state in having a law on the books that even if it never is actually enforced, frightens people into behaving properly. Okay? Something like that. Well, if we hold that, can we distinguish campaign finance laws where the interest is even stronger in people being able to give anonymously? Can we distinguish laws that require them to disclose their givers? How would you distinguish that if you would? And the other thing I would like to hear you distinguish is just what Justice Thomas brought up. The IRS requires disclosure for tax purposes. Okay? Private disclosure. The California wants disclosure, so it has a potential for finding out. And that potential, as I said, might in and of itself discourage people from acting improperly in respect to charities. So I'd like to hear the distinction, if you want to make them, between those two things. I would, Justice Breyer. Let me please take those in turn. For the first question, let me emphasize, there is no law on the books in California requiring Schedule B. What you have is bureaucratic win, and we submit that's different from a considered legislative judgment. Number two, the interest is not in reviewing Schedule Bs. It's in having them on hand prophylactically on a suspicionless basis from all charities to then review a tiny handful when an external complaint comes in. We are not here challenging the individualized request for a Schedule B from a particular charity, which the AG is always doing, if they actually have reason to read a Schedule B. So the interest on the state side of it, we respectfully submit, is really quite negligible. And you also alluded to a deterrence rationale. Let me emphasize, Justice Breyer, you won't find that rationale in the red brief from California. That is not only a post hoc justification for this law. It's a post hoc justification that comes solely from amici before this court. And there's not a shred of evidence to support that. And of course, there's no more reason to think a Schedule B sitting in the AG's hands as part of a warehouse is any more deterring by virtue of sitting there. It's only if it actually serves law enforcement purposes that it might do that. And of course, as you note, it is on file with the IRS in any event. So if there's a deterrent effect associated with filing it, it rationally follows that it's already being served before California asked for it to. Now, for the IRS, number one, there's a statute from Congress. Number two, it is for tax collection purposes. Number three, it has nationwide scope to it. And number four, there's a whole statutory design, Justice Breyer, that has criminal and civil penalties for any violation of confidentiality. There's no framework like that in California. And in fact, the record shows the opposite in terms of how likely these are to leak. Justice Alito? What does the record show about the number of concrete cases in which California has used this information prior to an audit? Justice Alito, we think there are five instances where that's happened in the past ten years. California seems to contend that there were ten. The district court found five. And the reason the district court found five is based on the testimony of the state's lead auditor, Steve Bauman, who had been serving as an auditor since 1988, had been the lead auditor since 2001, was designated as California's witness on this critical subject matter. And he, in his experience, Justice Alito, had used it once. He could think of one instance. When he surveyed all the auditors, they came up with five instances. And then the AG's attorneys added to get to ten. But that's the most they can get to. And I would just commend to the court the relevant record excerpts on this point. You can see Mr. Bauman's testimony. It's JA, Americans for Prosperity Foundation, Appendix 397 to 99. California says that on this record, you haven't even shown an entitlement to succeed on an as-applied challenge. What do you understand California to demand you prove that you haven't already proved? I don't know, Justice Alito, what you could possibly ask a charity in the position of these petitioners to prove that they didn't prove. Again, they had expert testimony. They had testimony from their officers. They had instances of horrific threats and violence, including death threats, that were directed against the organizations or their proxies who were in the same position that donors would be in. And I would note, Justice Alito, that what California contemplates for an as-applied challenge is very different from what you and the court contemplated in Doe v. Reed, where it was 130,000-plus petitioners who could have their First Amendment interests all adjudicated together. As we understand what California is requiring, it's not just an extremely onerous standard that's essentially impossible to meet, but you'd have tens of thousands of charities all having to go to court to try to vindicate their First Amendment interests. That's just not workable, and it's not a satisfactory solution to the First Amendment problem here posed vis-a-vis. California had quite a few leaks in the past, but they now tell us that they've changed their practices, and they're serious about confidentiality. What should we make of that? Should we hold them forever to their past breaches? Justice Alito, we think that they fall down before you even get to the confidentiality problems. Having adequate confidentiality protections, which they demonstrably lack, is a necessary but not sufficient condition to their demand being upheld. Really, it's the lack of narrow tailoring, the lack of a state interest. By the way, Justice Alito, I should emphasize, for Mr. Baumann's cases, those were not instances where it was the up-front collection of Schedule B that was useful. For all they know, it came in via audit letter. We think that confidentiality issues add to the record of unconstitutionality. Even as to those, just focusing on them, there's nothing California can do at this point that would convince reasonable donors and charities that have seen the dismal record of confidentiality lapses that now those have truly been fixed. Thank you. Justice Sotomayor? Counsel, if we were to apply the type of narrow tailoring you advocate, I don't see how the public disclosure at issue in Doe would have survived. In Doe, this court held that Washington State's requirement that signatories to referendum be publicly disclosed was substantially related to its interest in protecting electoral integrity. But there, the State Secretary of State, pardon the redundancy, checked signatures for fraud. That doesn't seem to be anything like narrow tailoring if that's what we were applying. It seems to me, as the Chief Justice pointed out, that McCutcheon is different than what we have been doing under exacting scrutiny. Under your theory of the case, though, Doe shouldn't survive. If I may, Justice Sotomayor, we think that Doe, respectfully, is categorically an opposite. It is explicitly specific to the electoral context. The court said so repeatedly in its opinion. Counsel, please, if that were the case, then Doe didn't have to go through its analysis. It would have just said it's electoral. And yet, it went through it. And Buckley itself said that the NAACP's exacting scrutiny was something different than what's the least restricted means of doing something. And Justice Sotomayor, we think you could stop short of requiring the least restrictive alternative even in this context and still reach the same result. All right, so let me go to everything you're saying about California, okay? I assume that the vast majority of charities are not involved in fraud. You're seeming to assume that the numbers of cases in which this is useful has to be dramatically large because charities are dramatically largely committing fraud. What if I disagree with you? Number one. Number two, the interest that California has in this schedule is in part there was testimony by the head of the charitable organization and by the auditing team that if you give out a subpoena or an audit letter, that it tips off and there has been history of these letters tipping off fraudsters and then hiding their illegality. So this disclosure saves them time because audit and subpoena letters take them a long time to get the information. B, it helps them identify when a report comes in of problems, whether it supports a further investigation. And C, it helps avoid the tipping that they're concerned about. Given that state interest, if the state had properly kept this non-public, why would it be not narrowly tailored? Let me take, if I may, the last part of that. Or even fit our usual definition of exacting scrutiny. Justice Sotomayor, you articulated the sole rationale California has for upfront collection. And let me emphasize to the court, it is not only post hoc and hypothesized, it is not genuine. It is also contrary, and I'll explain why. It is contrary to the factual findings that the district court made. You can see it in Petitioner's Appendix 47A. You will find no witness who identified any specific instance where the tampering that supposedly concerns California occurred. If the AG were genuinely concerned about tipping off charities, they would never do, Your Honor, what they always do, which is send an audit letter at the outset of any investigation, telling a charity that it's being investigated, and asking it to supply Schedule B, if relevant, along with all other relevant documentation, which charities always do. And during the years and years that tens of thousands of registered charities were not filing Schedule Bs, no one ever complained about that or sought to change it. It was a bureaucrat in the AG's office who said, oh, let's just require that all of these be filed. That did not come from audit staff. That did not come from line attorneys. And let me add one other point, if I may, Justice Sotomayor. It's implausible that the state is using Schedule B specifically in this prophylactic fashion. They have all the other 990 information, including Schedules L, M, and J, that go to interested party transactions, in-kind donations, and officer and employee compensation. It is really, I think, not a genuine interest that the state is asserting, and at best, it is a negligible one in the up-front prophylactic collection. Thank you, Counsel. Justice Kagan? Mr. Schaffer, I'd like you to assume a set of facts with me, and they're this, that there are some donors to some charities who are genuinely concerned about public disclosure for fear of harassment or threats, but that a very substantial majority of donors and a very substantial majority of charities are not concerned about that. In fact, they'd rather like public disclosure of their generosity. If that's so, could you win a facial challenge? Yes, Justice Kagan, for two reasons. One is that in the First Amendment context, we need only show a substantial number of instances. No, I'm saying the great majority are not concerned about this. Well, respectfully, I would question your Honor's premise. I think you have, from Paul Shervis, the fact that... Excuse me, Mr. Schaffer. My premise is supported by a lot of facts. Most charities disclose their donors, and in fact, it's part of their strategy. The more disclosure there is, the more fundraising and association there is. So anyway, let's just take my facts as a given. The very substantial majority of charities disclose themselves and don't mind disclosure. As to that, Justice Kagan, this court in City of Los Angeles v. Patel explained what the proper analysis is as to whether you have some voluntary compliance and non-objections. Those are outside of the constitutional analysis. Mr. Schaffer, just take it as a stipulation that the great majority of donors do not mind disclosure by anybody. Can you win a facial challenge on that premise? Yes, because we're not here to enjoin those charities from disclosing their donors to California or anyone else. They can continue to do so. California can request it, and they can comply with that request. I mean, I guess I would have thought that a facial challenge, you need to show that some significant number of people in the world actually have this concern. And otherwise, you should bring in a supply challenge. I thought that that was the whole point of the distinction between the two. And I do rest on City of Los Angeles v. Patel, which basically explained that that is not the correct analysis when you have some who will voluntarily comply and others who are resisting the demand. Can I ask another question, Mr. Schaffer? I heard you say to Justice Alito that even if there were a guarantee that this information was never disclosed, let's say that California had at least as good protections in place as the IRS does, better maybe, if that were so, could you win a facial challenge? Yes, because facially, there's no statute that protects confidentiality. Facially, you have the attorney... Again, Mr. Schaffer, I'm just stipulating that the statute does exist that there is at least as good a protection as in the IRS context. Could you win a facial challenge? Yes, Justice Kagan. We respectfully submit you could because of the lack of a state interest and the lack of narrow tailoring. In Shelton 2, the court was explicit. Even if the information would remain private and secured by the government, it was still unconstitutional. Thank you, Mr. Schaffer. Justice Gorsuch? I'd like to pick up where we just left off and understand more clearly your thoughts on why a facial challenge is appropriate here. Yes, Justice Gorsuch. I think anything short of facial relief here will be a pyrrhic victory for charities and donors that are counting upon this court's precedents and principles to protect them. And the reason for that is if you have to go to court and bring the as-applied challenge and go through the hurdles that California and the Ninth Circuit would interpose, even these petitioners who've been litigating for seven years, Justice Gorsuch, with the benefit of experts and recipient witnesses and their officers and horrific experiences that were recounted in court, we're still struggling to establish our First Amendment rights. And if every charity that's in this position and has concerns about exposure of their donors has to go down that same winding path, then the First Amendment will have lost before the next as-applied challenge begins. And we think analytically, doctrinally, in terms of precedent, it's especially clear in the First Amendment context that if we convince you there are a substantial number of instances where the law is unconstitutional, that warrants facial invalidation. Here we think it is unconstitutional in all its applications when you have a charity that doesn't want to produce its Schedule B and California has no narrow tailoring. And if I may, Justice Gorsuch, JA 42022, you have California officials specifically testifying, they've never considered even a narrow alternative. That is a constitutional defect that runs across all these cases. What is your understanding of the relationship between exacting scrutiny and strict scrutiny? The Court's not been perfectly clear about what one means relative to the other. I think what is clear in terms of the interest from NAACP versus Alabama on forward, it needs to be a compelling interest. And I think it's also clear, at least in the election context that we've been talking about, categorically, disclosure is at least presumed to be the least restrictive alternative. Buckley indicates it satisfies really strict scrutiny. And I think in the charitable context that we're talking about here, it may be less clear exactly what the standard of scrutiny is, but it is clear from this Court's precedents and holdings that there is at least narrow tailoring that is required. Once the Court requires that, California's demand cannot survive. The Ninth Circuit was able to uphold it only by dispensing with narrow tailoring altogether. And what would on your view, if anything, stop California from issuing boilerplate requests to all charities to disclose their Schedule B's after this, or to add it as part of the tax collection process? Well, the California Attorney General has no authorization, no mission to be collecting taxes. That's something that's completely separate in California. But if you're positing bad faith, we might challenge it as bad faith, Justice Gorsuch. No, no, no, I'm positing, I'm sorry, maybe I wasn't clear that two possibilities. One, fine, you get rid of this rule, but the AG issues a boilerplate request to organizations for the purposes of policing potential fraud, one. Two, that in the tax collection process, separate and apart from the AG, California starts mandating the disclosure of Schedule B's. I think they'd have to satisfy exacting scrutiny in either of those instances. Hopefully you'd get a considered legislative judgment that balances the competing considerations here, and make sure that there truly is narrow tailoring happening. And all we ask this Court to do in order to decide this case is stand by its precedents and principles. States need to think hard and tread carefully before they infringe upon the First Amendment rights that are at issue. And I would reserve rights respectfully to challenge either of the programs that you just posited, Justice Gorsuch. But they will have to withstand exacting scrutiny in our view of the precedents and the principles that decide this case. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Schaffer. Can you distinguish what California is doing from what the IRS is doing and explain how you would have us distinguish those two things? Well, we think the IRS clearly has a better set of defenses than California does because of their statutory mandate, because of the role that Schedule B's play in tax collection specifically, and in individual donors' exemptions, because of the IRS's nationwide charter that corresponds with the nationwide scope of Schedule B's, and because you have a strict confidentiality regime that exists from the statutes on down through careful protocols that are implemented on the ground. As to the chill, that too is different. For the IRS, it's not a demand by state law enforcement, which is what's at the core of NAACP versus Alabama and its progeny. The submission to a single federal regulator pursuant to a tight nexus and careful statutory design is much more limited than one state just asking for this willy-nilly and then other states essentially without limitation piling on by the dozens to the same request. Also, Justice Kavanaugh, the IRS is not in the business of posting submissions online the way that California is and has resulted in so many of these leaks quite predictably. And last, I'd note the IRS has credited concerns about Schedule B and is moving in the opposite direction of California. They're asking themselves the tough questions about whether they really need it and is it really worth it. California, quite gratuitously, is fishing for Schedule B's without seeing any real utility in them, at least in the upfront collection. You agree that what the IRS is doing is constitutional? It's a different case, Justice Kavanaugh, that we have not brought. I think it will be subject to exacting scrutiny in our view. You can count on the United States to provide, I'm sure, a very powerful defense. I guess a related question, but if California passed this same scheme in a statute and it was designed for tax collection and they had a strict confidentiality law that mirrored the federal protections, it would rise or fall as the IRS program rises or falls, correct? Not quite, Justice Kavanaugh. By the way, before the statute passed, all these amici who were here before the court, I'm quite confident in saying, would be lobbying the California legislature. I understand that, but suppose that they passed an exact duplicate statute of the federal statutory program. I still don't think it works, Justice Kavanaugh. I don't think it's as powerful as the IRS's justification because it is a nationwide form that lists donors nationwide, very few of whom will be in California. And of course California, its jurisdiction and concerns stop at its borders in a way that is not true for the federal government and the IRS. One very different question, but quickly, do you agree on the text of the First Amendment that the freedom to peaceably assemble is distinct from the freedom to petition the government for a redress of grievances? Yes, I think the Beckett Fund's amicus brief is extremely persuasive on that point from a textualist and originalist perspective and in explaining why the sort of demand you have from California is a direct restraint on that precious freedom as understood by the framers and codified in the First Amendment. Thank you. Justice Barrett? Good morning, Counsel. I want to pick up where Justice Kavanaugh left off. So, what if you had a law, say on a state university's campus, that made it illegal for anyone to engage in any speech whatsoever, but it was also the case that most of the students just shrug and said, that's fine, I'm not planning to, you know, demonstrate or picket, and there was just a small percentage of people who were bothered by it. Would it be facially unconstitutional? Of course it would, Justice Barrett, and I don't know that there's any case from this court that suggests the opposite. Okay. I'm sorry. I'll go ahead and I'll finish. And I think the city of Los Angeles, V. Patel, explains precisely why you look only at those who are objecting and are standing on their constitutional rights, not those who simply succumb. Okay, and this is where it relates to Justice Kavanaugh's question, then. That's because it's an invasion of speech directly. So I'd like you to discuss a little bit how you conceive of this right. Is it an independent right, say, the freedom to associate and the freedom to associate anonymously, or is it simply I mean, because showing chill makes sense if you're saying that this is simply to protect, and this goes to Beckett and Tamika's brief, Speech Down the Road. So can you describe a little bit the nature of the right that's at stake here? Sure. We think that there are multiple ones, but let me start with this, Justice Barrett, if I may. We think even the indirect restraint would be subject to exacting scrutiny and would require narrow tailoring for the reasons set forth in NAACP versus Alabama and its progeny, particularly in Shelton and in Gramellion, where narrow tailoring is required and the concern is indistinguishable from what you have here in terms of the concepts and the nature of the right. But we also think that there is a direct infringement on the right peaceably to assemble. I can't argue that any better than the Beckett Fund has, but we agree with their arguments. And also the right to solicit. Keep in mind that this is a condition to charities being able to speak as charities and hold themselves out as charities to the public, and Senator McConnell's brief, along with others, explains  to anonymously associate is an inherent part of the freedom of assembly? Yes, it is. It was precious to the framers. Anonymity was a core concern of theirs that's reflected in this court's precedence, McIntyre, Talley, and on down the line. But also the right to assemble is the right to assemble privately and peaceably. And when the government comes asking, tell us who your donors are, that is a direct infringement. Okay, and I want to ask you something. You've repeatedly distinguished the IRS form from the California use of Schedule B because of the fact that it's, you know, kept strictly confidential, and the IRS has a nationwide mandate, and you keep talking about the distinction between this not being a statute in California, but being, you know, something that was, I think you described it as subject to the executive's whim. And I guess I don't understand why all those things matter. I would have thought state action is state action. So if California, which has a statewide mandate, passes a statute, and, you know, as Justice Kagan asked you about keeping things strictly confidential, keeps it strictly confidential, it's done by statute, and it only applies to donors in the state of California. Is that a different case? Dovie Reed explained very well why the first thing in the analysis, even after you have least restrictive alternatives established in the election context, it started with the state's interest. And it had to credit that before it went on to the analysis of CHIL. And whether there's a statute that reflects a considered legislative judgment that, yes, this is really warranted, and it's really useful, should make a difference to this court's analysis. And I commend to you Justice Stephen's footnote 3 in his concurrence in Dovie Reed explaining that the strength of the state's interest goes up depending upon whether you have a considered and sure legislative judgment that's been made. Here you have the opposite of that, and you have the acknowledgement of California again. It's reflected in the joint appendix, and it's incontestable that they haven't even thought about narrow tailoring. Thank you, counsel. A minute to wrap up. Mr. Schaefer? Yes. If I may, Mr. Chief Justice. We think the rule of law that decides this case is clear, not fuzzy. Even if there may be semantic differences or questions of doctrine as far as strict scrutiny versus exacting scrutiny and least restrictive alternatives versus narrow tailoring being required, this court's holding and precedent are clear in Shelton and in Gramellion. Unless those are overruled, narrow tailoring at the very least, at a bare minimum, is required here. This court has insisted upon it repeatedly and has done so across the larger realm of First Amendment scrutiny. We don't know of heightened scrutiny in the First Amendment context that does not call for narrow tailoring, that does not say a state cannot be infringing upon these precious liberties gratuitously and disproportionately. Here, California's narrower alternative is obvious and unanswerable. It's an individualized audit request that we are not challenging and that California is relying upon in every case redundantly after the prophylactic upfront collection. To collect gratuitously and redundantly is the opposite of doing it narrowly. Thank you, Counsel. General Prilegar? Mr. Chief Justice, and may it please the Court. In its reply brief and again this morning in response to Justice Sotomayor's questions, the Foundation concedes that exacting scrutiny does not contain a least restrictive means requirement and for good reason. This Court's cases make clear that while it matters under exacting scrutiny, the standard is less stringent than strict scrutiny's narrow tailoring test. The Court of Appeals thus applied the correct legal standard to this reporting requirement. The Court also correctly rejected Petitioner's spatial challenge. Petitioners haven't shown that disclosure in the typical case involving the typical charity would expose donors to the risk of threats, harassment or reprisal. Absent that showing of an across-the-board First Amendment burden, they provide no basis to strike down this law on its face. Instead, Petitioner's evidence of burden focused on the harm to their own donors. We agree that the Court of Appeals analysis of the as-applied challenge was incomplete and the cases should therefore be remanded for the Court to properly assess the potential chilling effects on Petitioner's donors. I welcome the Court's questions. General, how do you think an as-applied challenge would work? Is a charity supposed to you know, the Schedule B is due to be disclosed. Are they supposed to attach an affidavit or something saying we're a very controversial charity and we think if people knew who gave money to us their rights to association would be chilled? This Court has recognized, Mr. Chief Justice, in cases like Buckley, that there shouldn't be unduly stringent standards of proof for purposes of adjudicating an as-applied challenge. So I think that a charity in that circumstance that thinks that its donors are going to face a reasonable probability of threat to harassment could come forward with any kind of evidence that would bear on that question. Well, but I mean, do you mean of the 60,000 or however many there are? I guess that's my question. When you say come forward with, does that mean they file a statement saying we're a very controversial charity? To prove that, here are a number of examples where our donors were harassed and then somebody in the AG's office would make a judgment about it? I just don't understand how it works. I think it could work in two different ways. So first, there might be those kinds of administrative procedures where the charity could seek an exemption from the Attorney General's office itself, directly. But of course here, the way that this was pressed in the lower courts was through a judicial challenge where the charity did not disclose its Schedule B requirement. Well, I mean, would you require that? Anybody who wanted to not have to disclose it would have to go into court? Not necessarily if they want to take advantage of any administrative remedies that might exist. And I think this court, in cases like Buckley and Doe vs. Reed, recognize that there do have to be those meaningful opportunities to obtain the as-applied challenge, but that that's what sufficiently safeguards First Amendment rights in this context. How would the administrative person in the California Attorney General's office decide whether a particular charity qualified for an as-applied exemption? We think that the relevant information would pertain to whether there is actually a risk of harassment, threat, or reprisal. So that could turn on things like hostility to the organization itself, any documented record of those kinds of threats against the organization, its members, its donors, other organizations like it. How many examples of people being abused do you have to have before you'll say, yes, that charity is a controversial one and they don't have to file a complaint? What would the schedule be? I don't think that it turns on a particular number. Instead, what this court has used to describe the framework is whether there's a reasonable probability, and it's emphasized that that's a flexible standard, that there shouldn't be unduly stringent burdens of proof. That's the exact reason we think this case should be sent back for the Court of Appeals to properly measure the chilling effect based on this kind of evidence, which we think does create a serious concern in this case. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, you speak of a chilling effect. What role would accusations that a particular organization is racist or supports white supremacy that if there's a view of that organization with that reputation, would it be a chilling effect if its contributors think that information or their contributions to the organization would be disclosed? Would that be more of a concern in that case than it would be, say, in the case of the organization that provides dog beds for adopted dogs or something? Yes. I agree completely, Justice Thomas, that we think that with respect to the forms of public backlash or that are associated with particular causes that have been the subject of public attention, that that might very well create that kind of chilling concern if the organization can show that it triggers this probability of threats or harassment. But that is clearly distinguishable from the case of the typical donation to the typical charity that isn't at all controversial but doesn't trigger that kind of public backlash. And as Justice Kagan noted, many charities already disclose the identities of their donors. Many sell their  And there is no basis in this record to conclude that in the case of the general application of this disclosure requirement, there's going to be anything remotely like the risks associated with organizations that instead have provoked that kind of public debate. And I would just emphasize as well that in that respect, we think the record here is on all fours with the record the court confronted in Doe versus Reed. Because there, the court recognized that although with respect to particular referendum petitions, there might be risks of harm arising from disclosure, there was no basis to think that that would apply across the board in each and every case. I'd like your reaction to somewhat related, but your reaction to this sentence from the reply, NAACP's reply brief in the NAACP case. And I quote, the right of anonymity is an incident of a civilized society and a necessary adjunct to freedom of association and to full and free expression in a democratic state. What do you think of that? Is there such a right? I think that what this court has recognized in considering claims like that is that privacy may in many cases be essential to the effective exercise of associational rights. But it's not invariably the case that that will be so. What the court has said in cases like Buckley is that there's a possibility that a disclosure requirement will interfere with association insofar as privacy might sometimes be important to protect the associational rights. But that's exactly why the court has adopted exacting scrutiny as the proper framework for measuring these claims to ensure that there is an actual burden on First Amendment rights produced by a disclosure requirement for purposes of assessing whether the state's law is valid. Thank you. Justice Breyer? I'd like to know what you think of the argument raised in several of the Mikey briefs anyway. But this case is really a stalking horse for campaign finance disclosure laws. What's the difference? If we hold, in your opinion, the government's view, if we were to hold against you and for the broader claims of the rule  that the petitioner brings, how would you distinguish disclosure in the campaign finance context? The right at issue, you heard Justice Thomas very eloquently explain that right and it would certainly seem to apply as much. And the need in the political forum, money is involved in both cases and the need to give anonymously would seem as strong and you could argue about the government's interest. So if that broad interest exists here, and wins, how would you distinguish campaign finance? Or would you? So I think that campaign finance disclosure requirements would still be distinguishable insofar as there are different interests, government interests that are asserted in support of those laws and where the court might conclude that there aren't other alternatives that could equally be as effective in pursuing those goals. But I want to be clear that we think that the same standard of review applies to disclosure requirements. And this distinction between electoral cases and non-electoral cases is illusory. Because the relevant point that this court has recognized is that disclosure requirements are subject to exacting scrutiny because they only affect protected associational rights indirectly. And they don't present the same risk that government seeking to suppress particular ideas or viewpoints or types of association. And for that reason, they should be subject to a less stringent standard of review, which urged the court to adopt and apply that framework to this disclosure requirement as well. Justice Alito? I was interested in your colloquy with the Chief Justice. Has California ever said that it will grant an exemption if a non-profit submits an affidavit or other proof that its donors will be chilled by disclosure? I'm not aware of any evidence about that in the record. And ultimately, these kinds of administrative remedies, I'm drawing a parallel to the campaign finance regulations. Well, if it's not in the record, then does every non-profit that fears its donors will be chilled have to do what these petitioners have done, which is to take California to court and fight the state tooth and nail for more than six years in order to avoid potential public disclosure of its list of donors? To the extent they're pursuing an as-applied exemption, I think that that's so, but I don't think there's anything wrong with it. And the corresponding rule that would facially invalidate this law would mean that in the mine run case where there's no First Amendment burden at all, nevertheless, the state would be precluded from regulating and pursuing its important interest in policing charitable fraud in this way. Do you think that would provide adequate protection for First Amendment rights? Do you doubt that donors to organizations that take unpopular positions on hot-button issues have reason to fear reprisals if those donations are made public? Do you think that's a legitimate fear in our current atmosphere, or do you think it's paranoid? No, I think that that can produce a chilling effect in individual cases, but I don't think there's any indication in this record that that kind of chilling effect is created across the board with respect to the average charitable organization, and there's simply no evidence here to conclude that individuals would stop donating to charitable organizations if this reporting requirement to the state were enforced in the mine run case. Let me ask you about your position with respect to this particular case, because I found it a bit puzzling. You say that the case should be remanded so the Ninth Circuit can consider, quote, how significant the harm would be to petitioner's contributors if their identities became publicly known. You know what the record here shows. The district court conducted a trial, and it found ample evidence that the contributors to petitioners would be harassed. And the brief filed by the American Civil Liberties Union and the NAACP Legal Defense Fund and other groups says, quote, petitioners have shown that people publicly affiliated with their organizations have been subjected to threats, harassment, or economic reprisals in the past and are likely to be chilled. What more do you think these petitioners would have to show? Well, I think the way that that kind of evidence factors in in this case, which of course involves a non-public disclosure requirement, is in measuring the chilling effect. So the reason that we think that the Court of Appeals was incomplete in its analysis is because although it concluded that there was no future prospective risk of inadvertent disclosure, it didn't consider the way that the past history here of unfortunate, widespread public disclosure might factor into a prospective donor's chill with respect to whether to continue associating with petitioners. And we think a donor would think about not just the risk of future disclosure, but also how severe the consequences would be. The more severe the consequences, the greater the chilling effect, even if that threshold risk of inadvertent disclosure remains relatively slight. Well, again, you know what the record here shows. Is it sufficient or not? I don't quite understand what your position is. Our position is that the Court of Appeals should complete its analysis and conduct that inquiry in the first instance. And ultimately the interest of the United States here is in the legal standards that apply to disclosure requirements in this context. So we haven't taken an ultimate position on the outcome of the as-applied exemption, but we do think it needs to be given meaningful consideration. Thank you. Justice Sotomayor? I am thinking along Justice Alito's questioning. And it seems to me that you are basically asking a question that you're saying the Ninth Circuit didn't answer. And the question you think the Ninth Circuit didn't answer is can due donors have a reasonable fear given the state's past disclosure problems? Is it reasonable for them to be chilled? Is that what you're asking the Court to do? Yes, Justice Sotomayor. That's largely how we think the chilling effect should be measured in this case. Now, if that's the way you think it should, and I actually may agree with you that that's what our case law would suggest, is that a factual question, or is that a legal question that we should answer? That's, I think, a mixed question. And in this realm, the Court has recognized that mixed questions should generally be answered de novo by looking at how the legal standard applies to the particular facts. Now,  what I've been struggling with in this case, and perhaps you'll tell me if I'm struggling rightly or wrongly, given what you believe our exacting scrutiny standard requires, it seems to me that what we look at first is can a disclosure hurt a party? Generally, we ask three questions, but if I take them backwards, we look at, is there a potential burden? And I think it goes   which is, and I think without dispute in this case, that the petitioners have shown that a disclosure of their donors could harm them. I don't think you dispute that, correct? If it were a public disclosure. That's the point. Now the question is, if it's not a public disclosure, which this law purports to be, we would balance whether the state has a substantial interest, not a compelling interest, but a substantial interest in this information. And I guess the other side is saying given the number of times we use it, even if it's small, ten times, this is a substantial interest. It helps us in our law enforcement. So the issue really is has the state proven that it's really going to keep this private? Isn't that the bottom line? I think that is a critical component of the inquiry here, and we agree that there is a big difference between public and non-public disclosure requirements, because of course non-public reporting reduces the risk that there will be any harassment and reprisals from third parties themselves. But just pulling back to provide our view on the overarching legal question that you were referring to, Justice Sotomayor, we do think that it's appropriate in every case to take account of both the burden on First Amendment rights and to use that as the framework or benchmark for assessing the sufficiency of the state's interest. Justice Kagan? General Prelogar, I'd like to get your views on this question that's come up about when a facial challenge is appropriate and when, on the contrary, it's not and a person should be remitted to an as-applied challenge. As you answered that question, I'd like you to answer Justice Barrett's hypothetical, which is that it would seem irrelevant that lots of people don't care about a blanket restriction on speech. Why is that any different here? I'll begin with that hypothetical. The big difference with the situation that Justice Barrett was positing is that that would have been a direct prohibition of speech and that creates all the concerns that maybe government's trying to suppress viewpoints or ideas and it triggers scrutiny in the ordinary course. Disclosure requirements are different because this Court has recognized that they may affect speech and association, but they do so only indirectly. And so it's necessary in every case to take account of the actual burden that's presented with respect to First Amendment rights. And I think that that explains why a facial challenge should not succeed here because there is no evidence in this record that there is any kind of widespread substantial burden in the typical application of this statute to the typical person contributing to a charity. The evidence that petitioners have focused on the harm to their own donors, we agree that that evidence is cause for concern, but just like in Doe vs. Reed, there is no reason to generalize here and suggest that the average person contributing to a charity would be similarly situated with respect to those harms. And I heard some questioning at the end of Mr. Schaffer's round about maybe this isn't an indirect restriction. Maybe associational rights are being directly violated, and some reference to the Beckett Fund brief. Do you have a view on that? Well, I think that that would run counter to this Court's long-standing precedent concerning disclosure requirements. The Court has again and again characterized those as indirect, and that's the reason that the Court supplied a different level of scrutiny, exacting scrutiny to those requirements. The Court has said that disclosure poses the possibility, but not the same certainty or inevitability of affecting associational rights. And so it would be a sea change in this Court's precedent to instead subject disclosure requirements to the same kind of scrutiny that attaches to more direct regulations of speech or association. General, there's been a lot of confusion about what exactly exacting scrutiny means. You started by saying it's definitely not a least restrictive alternative test. Some people say, well, it has to be narrowly tailored. What do you think of that, and what's the proper level of tailoring in this context? We think that the problem with trying to label it narrow tailoring is that that immediately connotes either the strict scrutiny least restrictive means test, or at least it suggests that there's some kind of universal fixed means and fit formulation that applies in this context. And instead, the way we read this Court's precedent, exacting scrutiny requires that the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights. That incorporates, in our view, an element of flexibility in the means and fit analysis that's intrinsically tied to that actual First Amendment burden. And the more significant the burden, the more stringent the showing the state will have to make that it has a sufficiently strong interest in regulating through its chosen means. Thank you, General. Justice Gorsuch? Good morning, General. I guess I want to poke a little bit further into this, the facial challenge question and your responses. I understand your response that a jury would have to come forward with some evidence that it's likely to be harassed or that its donors might be. But doesn't that kind of put the cart before the horse or invert the First Amendment analysis? Because you're placing donors and organizations, so the argument goes, in the unenviable position of having to prove that they have been harassed in order to vindicate their First Amendment rights for privacy in associations. Well, Justice Gorsuch, I think again, drawing on this Court's analysis in Buckley, it's certainly true that courts have to ensure that they are not holding organizations to unduly stringent burdens of proof. And I would point the Court, actually, to this Court's analysis in Shelton, which Mr. Schaefer repeatedly relied on. I understand those are nice words, but I'm looking for something a little more concrete, General. How would you protect, if you agree as I understand you do with Justice Thomas, that the right to association includes the right to privacy in that association, how do you protect that when you're requiring donors and organizations to come forward to prove that they have been harassed? Well, to be clear, and I want to make sure that I'm being absolutely clear on this point, what the Court has said is that privacy in association may sometimes be critical to the effective exercise of the right, but that's not invariably the case. Now, with respect to the actual evidence that organizations need to come forward, ultimately they don't need to show that there have been specific incidents of harassment tied to the particular disclosure requirement at issue. Instead, the Court has said that any evidence that suggests that there's public hostility to the organization, to its individual members, that there have been past practices to demonstrate a pattern of hostility could suffice to show that there really is a chilling effect in this circumstance. So do you think, for example, then that the government could compel private organizations to hand over their I don't know, some examples in the briefs I saw were their holiday card list so that it can ensure the accuracy of mail delivery or young persons, a list of the people they've dated so they can do a survey on marriage patterns What would be wrong with, in your view, those sorts of things, at least unless they come forward and show that they've been harassed or are very likely to be as a result of this disclosure? Why isn't that put another way, why would it be wrong to think that this is a problem of compelling speech? Well, I think that the big difference with those hypotheticals is they would likely present very different balance of interests with respect both to the burdens and to the state interests. So just taking each of those in turn But in each case, you're compelling speech from a party who doesn't wish to Why isn't that a problem? Oh, to be clear, no party here is suggesting that these disclosure requirements should be analyzed under compelled speech I'm asking you whether they should be. I don't think they would succeed if they were. The court has held in cases like Goddard that so long as what's being compelled is purely factual information the First Amendment won't necessarily be violated. Now, of course, they present serious associational freedom concerns, and I think that that's why the parties here have focused in this case on the privacy in association. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good morning, General Prelogar. There's an impressive array of amicus briefs supporting petitioners here across the ideological spectrum and one of them is from the American Civil Liberties Union, the NAACP Legal Defense and Educational Fund, and the Human Rights Campaign, among others. And that brief says, and I'm going to quote you something and then get your reaction to it. Quote, "...a critical corollary of the freedom to associate is the right to maintain the confidentiality of one's associations absent a strong governmental interest in disclosure. If the state could categorically demand disclosure of associational information, the ability of citizens to organize to defend values out of favor with the majority would be seriously diminished." End quote. Your reaction to that amicus brief and the amicus briefs more generally that are supporting petitioners? With respect to that amicus brief in particular, a critical part of that brief was to observe and to argue that this disclosure requirement should be treated as a public disclosure requirement. So I just want to flag at the outset that the ACLU and the NAACP themselves recognize that there is a public disclosure. With respect to the amicus brief and that showing more broadly, it's certainly the case that there are many organizations that may desire that kind of privacy and association. The relevant question is whether the state should be foreclosed from regulating in a particular way based on a showing that the disclosure requirement truly creates First Amendment burdens. And I'll just emphasize as well that there are an array of amicus briefs on the other side, including from associations of nonprofits. The California Association of Nonprofits with 10,000 member organizations. The National Council of Nonprofits with 25,000 member organizations. And what those briefs suggest is that there is a critical role to be played in having the state police charitable fraud to ensure that donors have confidence in charitable organizations, which itself increases the willingness to donate and therefore the pursuit of philanthropic efforts. Turning to the text of the First Amendment, do you agree that there is a right of the people peaceably to assemble? I certainly agree that the assembly provision is an independent First Amendment right. But of course, here, no party is pressing that and focused on the right to associate. In terms of applying strict or exacting scrutiny, sometimes those words really are just asking the question, not answering the question. You're asking whether the state has an interest sufficiently compelling or important to warrant an exception to a constitutional right or to spell out the contours of the rights. And two things the court has often looked to in applying that to state laws, say in the free speech context and others, is one, whether the exception is historically recognized that a right has coexisted with an exception of some kind historically. And the second thing the court's often looked at, not exclusively, but has looked at is how many states have also shared this same interest. So here, I think there's not a historically recognized exception of this kind, although I want to get your response to that. And second, what do you say about the fact that this California interest can't be all that important, so the argument goes, because 46 other states have not sought this kind of information? Well, let me take each of those, but I'll do them in reverse order. On the number of states that regulate in this way, I don't think it could possibly be the case that California's law could be invalid just based on that kind of headcount. Obviously, states in our federalist system can choose to devote different levels of resources to problems. They can choose to regulate in different ways and have different priorities. What California has shown is that it's prioritized this issue of charitable fraud in the state. It's devoted far more  And I think it's done so because of the sheer number of charitable organizations that solicit in the state and the amount of their donations, which are somewhat unique in number and that's prompted California to act in this way. So I think the relevant question isn't how it compares to other states, but whether it has sufficiently justified this law. Thank you, General. Justice Barrett? Good morning, General Prelabner. I have a question about tailoring. Let's say that I agree that exacting scrutiny applies. The Ninth Circuit didn't really engage in any kind of tailoring inquiry. I think what it did could more fairly be described as a balancing of interests. You kind of demurred a little bit when you were asked about what level, if any, of tailoring is required. So do you agree there has to be some kind of means and fit or not? Yes, we do think that there is a means and fit, but we think that it's incorporated into the requirement that the strength of the governmental interest has to reflect the seriousness of the actual burden on First Amendment rights. And so that will vary depending on the context or the circumstances based on the showing with respect to First Amendment burden. And again, the more serious the burden, then the less likelihood that the state has a sufficiently strong interest in regulating through its chosen means. And Justice Barrett, just to close the loop on this, I do think that the Court of Appeals here considered alternatives. It specifically discussed the audit letters, subpoenas, and explained why those would be less effective at allowing California  at the outset and responding to complaints before it's formally opened in an investigation and cited that tip-off concern and other concerns related to having that information at an early stage. So I don't think it's accurate to suggest that there was no means and fit analysis in the lower court opinion. General, let me read you this language from Shelton and tell me if you think that you would agree that this is the standard we should apply when thinking about means fit. There, the Court, we said that in evaluating means and fit, we struck down the law because we concluded that the government's purpose, here's the quote, cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved. Would you be satisfied with that standard? I think that standard applies based on a showing of substantial First Amendment burden, and that's specifically the context in which this Court articulated that language in Shelton. It said that the disclosure requirements there would chill every teacher in the state from associations because the teacher lacked tenure protection and would naturally avoid any associations that might cause concern for the employer even though it didn't bear on the fitness of the teacher to serve in that capacity. Okay, let me ask you about that predictive judgment then. So in pressing for as-applied challenges here, talking about whether this record adequately establishes that the petitioners have reason or their donors have reason to fear retaliation, what if the petitioners here had filed this challenge right at the beginning before any of these incidents of violence had occurred? How is the state supposed to judge whether there's chilling? So the Court addressed this in Buckley, and it said there, with respect to minor political parties, that if there's a new political party that doesn't have, for example, a history it can point to, then it can rely on evidence with respect to related organizations or organizations that share similar missions. So the Court has specifically acknowledged this concern and made clear again that there has to be... But would it be different, say, in what evidence is the Court supposed to look to? Political climate of the particular state? I don't think that it should be limited in that way. And again, I don't think that it should be an unduly narrow inquiry. So I think that the petitioner should be able to come forward with any evidence of harm that's occurred anywhere for purposes of trying to show that there would actually be a chilling effect in this case. Thank you, General. A minute to wrap up, General? Thank you, Mr. Chief Justice. To wrap up, I'd like to focus on the legal standards that we think the Court should apply here. The Court's cases make clear that exacting scrutiny applies to reporting requirements, that the standard does not contain a least restrictive means test, and that a facial challenge should be rejected when, as here, there is no basis to conclude that disclosure poses a risk of threats, harassment, or reprisals in nearly all of the law's applications. But the other relevant legal standard is that organizations need to have a meaningful opportunity to claim an as-applied exemption from compelled disclosure when it would subject their particular donors to harassment or intimidation. Petitioners presented evidence of these kinds of harms, and we think the Court of Appeals should have considered that evidence in measuring the chilling effect of this law as applied. We'd urge the Court to confirm these legal standards and remand for the Court of Appeals to assess the as-applied challenge in light of them. Thank you, General. General Feinberg. Mr. Chief Justice, and may it please the Court. Petitioners advance two claims, a facial challenge and an as-applied one. Those claims are reviewed under exacting scrutiny. The standard this Court has long applied to reporting and disclosure requirements. To prevail on their facial claim, petitioners must demonstrate that California's Schedule B requirement is unconstitutional in all or at least many of its applications. The petitioners' evidence centered only on their own organization. They did not show that California's confidential collection of the same information that charities already provide to the IRS chills associational interests in general or for a substantial number of charities in the state. At the same time, the state's up-front collection of Schedule Bs is substantially related to important oversight and law enforcement interests. Schedule Bs are used routinely by state charity regulators to evaluate complaints. When examined with other documents, a Schedule B helps investigators determine if there is a concern with self-dealing, diversion of charitable assets, or gift-in-kind fraud that warrants a formal investigation. Petitioners' as-applied challenges center on the claim that submitting their Schedule B forms to state charity regulators will lead to threats and consequences. The Schedule Bs are confidential under California law and the state has bolstered its confidentiality protocols in response to past lapses. There is no reasonable probability of harm sufficient for as-applied relief. I welcome the court's questions. I guess I want to follow up on that point you were just making, General. Assume you have a charity that supports a cause that is controversial and a number of organizations people have said they will make life miserable for anybody who supports that charity. They'll pick it outside their house, they'll boycott anybody doing business with them. If that person came to you and said I want to give a donation, but I want to be sure that California will not disclose this, that it will not get out, can you give me 100% assurance that that will not happen? What would you tell that person? Mr. Chief Justice, I don't think any organization can guarantee perfection, but here the state has promulgated a regulation codifying the confidentiality status of Schedule B and it has enhanced its protocols in response to past lapses. The District Court at 62A of the Law Center's Petition Appendix called those efforts commendable. And so we don't think there's any probability that those harms would come to pass in light of the non-public nature of this requirement. I'm sorry, there's no probability or, I didn't catch the adjective there, no reasonable? No reasonable probability that the harms that Your Honor just laid out would come to pass. Reasonable probability, okay. You talked about the state routinely using this and all that. I just want to make sure I understand if your statements there were consistent with the findings of the District Court or if they were meant to dispute those findings. Your Honor, the District Court discounted uses of the state's Schedule B for evaluating complaints, although it did state at 56A of the Law Center's Petition Appendix that it did not doubt that the Attorney General's Office used Schedule B's. It did not regard that as deficient because in its view a use of Schedule B that was not strictly necessary or where there were not any other alternatives did not suffice to substantially further the state's interest and we think that was legal error. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, I'm interested in your discussion of the non-public disclosure laws. The fact that you would have this internally and not disclose it to the general public but throughout at least recent history or not so recent history the Japanese internment cases that census data was used to locate them. The NAACP Council on American Islamic Relations in their brief in this case alleged that the U.S. government uses data to locate American Muslims. In the civil rights cases like the NAACP case, the local government, state governments wanted data in order to locate them. So how can we say that there is a difference in public disclosure versus non-public disclosures? Your Honor, the concerns you raise, of course, are very significant ones, but they are not present here. The district court made no finding of potential state reprisals or retaliation against charities and there is no evidence in the record to support any such concern here. With that in mind, do you think it would be reasonable for someone who wants to make a substantial contribution to an organization that has been accused of being racist or homophobic or white supremacist that in this environment that they would be chilled because they have reduced or no confidence that their  will be kept confidential? Your Honor, those concerns are certainly relevant for consideration of an as-applied challenge, but in any as-applied challenge the question is, is there a reasonable probability of threats, harassment, or reprisals which would turn on, one, the risk that Your Honor noted about those kinds of harassment, but also the risk of public disclosure and here with a non-public reporting requirement, those risks of public threats, there would not be a significant possibility of those. But you think that there is in that calculus, do you include the possibility of an individual who happens to disagree with or dislike that particular group that someone would consider that a possibility? Justice Thomas, that generally certainly would be a relevant consideration. I don't there is no evidence in the record of suggestive of that sort of willful or advertent kind of retaliation. Thank you. Justice Breyer? What do I read in the record to show that this statement of the other side is wrong? I assume you think it is. The statement is, as I paraphrase it, there is no need for this. You can't say there isn't some risk of leakage. It's never been necessary really or hardly ever, and at the very least you could have a carefully tailored, like New York's, which is more carefully tailored statute, the same thing. I thought the answer might be Mr. Smith, the charity, goes and buys a piece of land or property in San Francisco or New York. It belongs to a major donor. Maybe he overpaid. Huh. This law means any charity will be very careful before they get into that fix. That's called preventative. You don't make that argument. You're making the first. What's the answer to the first? Why didn't you make the second argument? There's some good reason. Justice Breyer, the record shows that the upfront collection of Schedule B assists state regulators in evaluating complaints to detect precisely the sort of self-dealing concerns that your question is premised upon. With upfront collection, the state is able to evaluate complaints, look for those kinds of situations, decide whether a formal investigation is needed, and if so, focus the investigation on the relevant concerns. The alternatives posited by my friend would not be sufficient to meet those needs. The state would not have the ability to evaluate, to see Schedule B information in connection with other information to decide if an investigation is even needed. Audit letters and subpoenas after the fact lead to delays. They also lead to considerable burdens on charities, and it is not clear that the state would be willing to provide the Schedule B in response. I thought I heard my friend say that any routine requests for those sort of audit letters would be something he would challenge. Justice Alito? Counsel, would your scheme be facially unconstitutional if you publicly disclosed these donor lists? Your Honor, in that circumstance the burden on charities and their supporters would be higher, and so a stronger interest would be needed. We don't assert an interest in public disclosure. There could be circumstances where it could serve an interest, but we don't assert any such interest here. Are you willing to say that that would be unconstitutional? Your Honor, as a facial matter the challenger would still have to show that it was operating unconstitutional in all or a substantial number of cases, which would require showing that the sorts of public threats, harassment, and reprisals would occur, and as Justice Kagan was noting before, many charities do not have those types of concerns with the public knowledge of donations. The brief filed by the ACLU and the NAACP Legal Defense Fund says that we should regard your system as a system of de facto public disclosure because there have been such massive confidentiality breaches in California, and from the perspective of a donor that may make sense. A donor may say, this is a state that has been grossly negligent in the past. No sanctions against anybody who has leaked this information. I have to assume that this may happen again. Why isn't that a reasonable way to look at this? I don't think even the district court regarded it that way, Justice Alito. At 62A of the Law Center Petition Appendix, the district court said that the Attorney General's Office's efforts to rectify past lapses and to prevent them in the future were commendable. It said your past record was shocking. Did it not? In the foundation decision, it did. Following the court's analysis of the evidence regarding the changes to the state's protocols, it called those efforts commendable. Its concern at the Law Center, its concern at that point was that the state could not guarantee confidentiality. Let me get a sense from you what you think would be necessary in order for an as-applied challenge to proceed. Let's take as an example the brief filed by the Proposition 8 Legal Defense Fund, where they detail evidence of vandalism, death threats, physical violence, economic reprisals, harassment in the workplace, the well-known case of Brendan Eich. Do you think that's sufficient? If they came to you with that, would you grant them an exemption? Justice Alito, this is a non-public reporting requirement, so there is no reasonable probability that that sort of threat, harassment, and reprisal from the public would come to pass. But we agree with the United States that as a general principle of law, there is a flexible evidentiary standard and challengers to reporting or disclosure requirements can draw from a wide range of evidence in order to... Well, my time is up, so your answer is basically that no as-applied challenge can ever succeed because what you have, at least purportedly, is a private disclosure system. Justice Alito, there is with a challenger who is asserting concerns related to threat, harassment, and reprisals from the public, that they would not be able to satisfy the standard because there isn't a reasonable probability that that information would be made known to the public. I understand your position. Your position is no as-applied challenge can ever succeed. There could be. For that reason. Pardon me? For that reason, no as-applied challenge could ever succeed. With respect to a non-public reporting requirement with a challenger asserting claims, asserting threats, harassment, and reprisals from the public, that would be a very difficult standard to meet because... Thank you. My time is up. Justice Sotomayor? Counsel, I believe, and my memory could be wrong, that the district court in the end commended you for the effort you had made for privacy, but that it concluded that given the breaches in the past, that a reasonable person, donor, might not have that much faith in the AG's office, and that it would chill them from making donations. And that's one of the reasons, if not the reason, it issued the injunction which the Ninth Circuit vacated. So, what are we to do with that? I mean, isn't that the nub of this? An exemption is only necessary if you're going to make it public, and you're right. The district court has to determine whether your office has a reputation or a reasonable possibility that it's going to engage in political retaliation and leak it secretly, etc., etc. But what do we do with that finding? That given your past breaches, you have essentially turned this into a public disclosure case. Justice Sotomayor, I read the district court's decision as, as you note, commending the AG's office for its changes, but faulting the Attorney General's office for, at that point, not being able to guarantee confidentiality. We don't think that sort of guarantee can be the standard, and that's... Well, let me just give you an example, and I think someone said this earlier, and I have been the other side. How about if the requirement was that you hand-deliver this list to somebody in the AG's office who's going to put it in a locked file? Is that a guarantee better than putting it on the Internet with all of the anti-hacking procedures you have? There is a normal human fear about hacking, that they can hack anything. Isn't that hypothetical? It's true that general concerns about hacking would not be present. By the way, there is a serious question. If someone came in and argued that they were fearful on general hacking, we probably, under Clapper, would say they don't have standing to claim an injury. But go ahead. With respect to hacking, Justice Sotomayor, it is a present risk in modern society that no system can have a 100% safeguard against, but the important point... Executing the IRS. Correct. Indeed. But the important point here is that petitioners did not bring forward evidence suggesting that even in light of that background risk, that charities in general, or at least a substantial number of them, were chilled in their contributions. Indeed, the amicus briefs from Cal Nonprofits and the National Council of  that robust attorney general oversight actually promotes charitable giving because it promotes trust in the charitable sector. Justice Kagan? Ms. Feinberg, I'd also like to ask you about the Petitioner's As Applied Challenge. You lost that below, and we in the District Court and its findings are reviewed only under a clearly erroneous standard. And the District Court said two things. It said there was a pervasive recurring pattern of inadvertent disclosure by California, and it said that donors would likely be subject to threats and harassment if their affiliations were disclosed. So, given those two findings, given a clear error standard, how can you win on the As Applied Challenge? Justice Kagan, we think that the District Court's ruling was premised on its observation that California could not guarantee confidentiality even after bolstering its protocols. If the Court disagrees with the Ninth Circuit's approach to considering the District Court's characterization of the confidentiality measures, the appropriate course would be, as the United States suggests, which is to vacate and remand on the As Applied Challenges only, and to reconsider the question in light of the District Court's framing of the confidentiality protections. I'm wondering about the relevance of your new regulation. You know, usually, we don't allow parties, the governments, to come in and say, you know, we've reformed our ways, we've changed our practices, we'll do better in the future, you should give us a pass. So, why isn't that what you're asking for here? Justice Kagan, the regulation codified existing practices in the Attorney General's and an existing policy. The petitioners here are seeking prospective facial invalidation and the District Court considered the updated protocols and the new regulation in connection with the challenge and we think that that, they're relevant for that reason. On the question of threats and harassment, if an organization comes in or some of its members and shows that they have been in the past subject to such threats, do they need to do anything else in your view? Is there a requirement that they show that those threats have led to chill or is it enough if they show threats and harassment? In general, with respect to the public disclosure requirement, the question is whether there's a reasonable probability that those threats, harassment, or reprisals would occur and if they do, it's reasonable to conclude that that sort of significant repercussions would arise, would demonstrate a deterrence for associations or associations.  probability that those associations are making contributions to charity because of the significance of those sorts of consequences. Thank you. Justice Gorsuch? Good morning. If the First Amendment protects the right to associate in private, why do we need to consider harassment? Justice Gorsuch, this is a very important question.  prohibits harassment. Those rights may be implicated by disclosure and reporting requirements, but they don't do so invariably. We certainly said that proof of harassment can be very significant evidence that the First Amendment right to associate has been infringed, but we've also said that the First Amendment right to associate includes the right to do so privately, right? The court has recognized that privacy is a concern where the disclosure of associational information would lead to deterrence of associations because of the reactions that the information would prompt in others. So could the government on that account require private associations to reveal any manner of information? Their Christmas card lists, their dating lists, whatever, so long as there's no evidence, or at least not a reasonable probability of reprisal? Justice Gorsuch, I think in those situations, it would be much more difficult for the government to come forward with an  important to justify the burden because there would be... Well, there's always some good efficiency argument. I mean, we've heard about efficiency in administration here. I'm sure there's efficiency in post office services or census information. So let's suppose the government can't come up with something that sounds like that. In any case involving a disclosure or reporting requirement, the government must come forward with an interest that is sufficiently important to justify the burden. So you do agree that there is this right to privacy of association that the government must overcome. Where a plaintiff demonstrates that a disclosure or reporting requirement is in fact resulting in the kinds of burdens that Your Honor's hypothetical would likely show, then yes. My hypotheticals included no reprisals of any kind. They choose to associate privately. The Christmas card lists they're dating about history are private information. There's no reprisals though. But could the government come in in the name of efficiency and good government come in and require disclosure of those kinds of lists? I think that would be very difficult because in that situation there would be a significant burden on intimate association. There would very likely be a significant burden resulting from public dissemination of that kind of information. And as a result the government would have to come forward with a commensurately strong justification and it wouldn't be clear to me in that context what that interest would be. Thank you. Justice Kavanaugh? Thank you Chief Justice and good morning Ms. Feinberg I was asking Petitioner's Council about the IRS disclosure requirement something that you have emphasized in your briefing and you heard Petitioner's Council's efforts to distinguish the IRS situation from what California is doing here and I just wanted to give you an opportunity to respond to that. Justice Kavanaugh California collects Schedule B information for many reasons analogous to why the IRS does but as a formal matter regarding the constitutional analysis we agree with the United States that it's different because the IRS rule is a condition of a tax benefit and those rules are analyzed under a different framework but California's reasons for collecting Schedule B up front collecting Schedule B's up front is analogous to the IRS because in both circumstances regulators have concluded that knowing the number knowing the identities of the very small number of individuals who may be in a position to influence the financial decisions of a charity are relevant and important for regulatory oversight purposes. One thing we've looked at, the court has looked at in prior cases involving individual rights is in assessing the strength of the state's interest is how many states have similar laws and you heard me ask General Prelogger and she had a good answer about each state has to assess its interest differently but it still doesn't show that it's not really all that essential to a state's interest if 46 other states have seen fit to regulate without infringing on the right to assemble or the right to associate in this same way. Just how would you respond to that? I don't think it undermines California's interest for many of the reasons that the United States articulated. Different states have made different judgments regarding their priorities and different states face very different regulatory challenges. In California there is a very large population of charities that solicit billions of dollars from state residents and the state has made it a priority to protect state residents from diversion of charitable assets and deception and that is the basis on which California has concluded that upfront collection of Schedule B information is important for furthering its interest. Thank you. Justice Barrett? Good morning General Feinberg. Let's assume that I think that California has a substantial interest in collecting this information for purposes of policing potential fraud. Let's also assume that I think that the personal liberties, right to association, right to speech are significantly burdened. What kind of means do I look for then? How do I resolve those competing interests? Justice Barrett you would look at whether California's interests are commensurate with those burdens. We think we have clearly shown that here given the uses of Schedule B and how it helps in connection with other information. So is that a tailoring requirement? I'm not talking about least restrictive alternatives. I assume I think exacting scrutiny and not strict scrutiny applies. That doesn't preclude just like an intermediate scrutiny it doesn't preclude a means ends fit requirement, right? Justice Barrett we agree that the exacting scrutiny encompasses consideration of the means and ends and the degree of fit required will turn on the severity of the burden. Here petitioners have not demonstrated such a burden with respect to all. But I told you to assume that I said that they did. Let's assume that I think these petitioners have shown a substantial burden and I'm granting that California has a substantial interest. So you're really advocating just a balancing test, right? Like does the burden outweigh the benefit to California? You're not proposing any kind of means ends tailoring inquiry? No, we do think there is a means ends fit analysis and we think here the means California has chosen are well tailored to the ends. So well tailored is the standard not narrowly tailored? Justice Barrett, the term narrow tailoring can mean many things in many contexts and so but we do think that under exacting scrutiny and in your honors hypothetical where there is a significant burden there would be a necessary means ends fit. We think that it's satisfied here because California Well I understand you think it's satisfied but in considering that means ends fit we look to alternatives and see what other less restrictive alternatives might be available and it doesn't mean you have to choose the least one. But we would consider other alternatives, is that right? Yes, Justice Barrett. It would be a relevant consideration in assessing whether the state has satisfied or is acting with the state's means are sufficiently tailored. Thank you. Let me shift and ask you something else. So there are 250 organizations who filed briefs in support of the petitioners here arguing that the disclosure mandate would harm their rights. Is that enough for a facial challenge? I gather your position is no. So I'm wondering how many would it take? This court's precedents require different standards for facial invalidation but even the most liberal is that a facial challenger has to show a substantial number of unconstitutional applications. There is no such evidence here and as the United States Department of Justice has said,  However, the court's briefs in support of respondents have indicated that they support robust Attorney General oversight because it actually promotes charitable giving by promoting trust in the charitable sector. Thank you, General Feinberg. A minute to wrap up, General. Thank you, Mr. Chief Justice. However, the court resolves the as-applied claims. There is no basis for departing from the established exacting scrutiny standard or invalidating California's requirement with respect to all registered charities. Exacting scrutiny is the appropriate standard for judging disclosure and reporting policies. The standard requires the government to have a sufficiently important interest and to demonstrate that actual burdens on First Amendment interests are justified just as the state has done here. Facial challenges are reserved for rare cases where a law is unconstitutional in all or many of its applications. Petitioners have not met that standard here because they have not shown that California's requirement kills contributions in general or for a substantial number of charities operating within the state. Thank you. Thank you, Counsel. Rebuttal. Mr. Schaffer? Thank you, Mr. Chief Justice. Let me begin where my friend left off. Facial challenges are less rare in the First Amendment context. The court has special solicitude for them in this context. This, Your Honors, when we're talking about First Amendment rights, is where facial challenges succeed. And it succeeded in Stevens, in U.S. v. Stevens, without the court asking how many groups out there would be interested in Animal Crush videos and how many would just follow the general showing of reproach that was reflected in the statute as opposed to wanting to continue to publicize those videos. You can know, as you sit where you sit, that in fact a substantial number of charities and many multiples of their donors are going to have the same interest that these petitioners do and suffer the same constitutional deprivation absent facial invalidation. And that's the same judgment that the court made in Shelton, making that predictive judgment as Justice Barrett put it, as to teachers, some of whom might have had associations with the PTA and other innocuous associations, but the court recognized that there would be an inherent chilling effect. What we have in our record vividly illustrates just how pernicious the chill can be, just how real the threat to donors is, but that's always been baked into this court's precedence and it should remain baked in and it's a recipe for facial invalidation. That's especially true, Your Honors, because I'm delighted to hear both the United States and California agreeing today that means and fit is required. Once it is required, we respectfully submit that ends the case. It is undisputed that California's prophylactic, suspicionless demand sweeps in the Schedule B's of tens of thousands of charities annually and there are many multiples of those charities in terms of the donors whose information is being placed at risk in this very threatening way. And according to the record, Planned Parenthood Schedule B for instance contained hundreds and hundreds of donors that were on there. The record also makes clear, and my friend Ms. Feinberg does not deny, that California is never reading these Schedule B's unless and until an external complaint comes in from a news story, from an internal whistleblower, from an agreed donor, and at that point, if it thinks that there's a serious complaint, it's asking for the Schedule B pursuant to an audit letter. So this is a totally gratuitous First Amendment intrusion and continuing to insist upon some sort of means and fit is dispositive of the case and dispositive of it basically, especially because we need only show a substantial number a substantial number of unconstitutional applications, even if you thought it was 5% or 10% of all charities we're still talking about thousands and thousands and many multiples in terms of the donors. The notion that there's no evidence in the record of general backlash and concerns among charities and donors, I have to respectfully correct. If you look at the Thomas More Law Center's Joint Appendix 197, you'll see Professor Shervish's testimony about the Donor Bill of Rights and how important this principle is to charities as a general rule, and note the outpouring of amicus briefs as your honors have today. Justice Sotomayor asks whether the sole question is whether the state will truly keep this information private. We don't think it is. I respectfully agree with Justice Gorsuch that does put the cart before the horse. The court in Dovey reads started by analyzing the state's interest and whether it was weighty enough. Here, that California falls down and it doesn't have, as it has in the election context, disclosure as an established, least restrictive alternative. Thank you, counsel. The case is submitted.